# COLUMBIA NATIONAL SAND DREDGING COMPANY *v.* MORTON.

---

APPELLATE PRACTICE; LOCAL AND TRANSITORY ACTIONS; JURISDICTION; INJUNCTIONS.

1. Although no suggestion of want of jurisdiction of the lower court was made by the appellants in an equity cause in this court on appeal, the court, when the case was called for hearing, declined to hear argument upon the merits of the questions involved, until satisfied that the court below had jurisdiction of the subject-matter of the bill, and required argument on that point.

2. It is to the principal question involved in any case, that the court looks to determine whether the action is local or transitory in its nature; and, if such question relates to land, the action is local and must be maintained in the place where the land is located.

3. A bill in equity by one claiming to be the owner of the bed of a creek in Maryland containing a sand and gravel bar, to enjoin dredging therefrom, is not maintainable in this District, although the defendants reside here, where the ownership of the complainant of the bed of the creek is denied by the defendants, and the principal, and substantially the only, question involved is one of title to the sand and gravel bar.

4. Section 1 of Rule 18 of this court, providing that costs shall be allowed the appellee upon dismissal of an appeal, except where the dismissal is for want of jurisdiction, applies only to those cases where this court has no jurisdiction, and not to cases where the trial court had no jurisdiction. In the latter cases this court has

D. C.]                    Statement of the Case.

jurisdiction for the purpose of reversing the erroneous judgment or decree.

5. Where in an equity case, on an appeal by the defendants from a decree granting the relief sought by the complainants, the question of the jurisdiction of the lower court to entertain the suit was not raised by any of the parties, but was raised by this court, of its own motion, and after argument upon that question alone the decree was reversed on the sole ground of want of jurisdiction in the lower court, each party was required to pay the costs incurred by him on the appeal.

No. 1678.   Submitted October 19, 1906.   Decided November 7, 1906.

HEARING on the question of the jurisdiction of the Supreme Court of the District of Columbia, sitting as an equity court, to entertain a bill for an injunction and to pass a decree perpetuating a preliminary injunction against acts of continued trespass on land in Maryland; which question was raised by this court when an appeal by the defendants from such decree was reached for hearing.                    *Appeal dismissed.*

The COURT in the opinion stated the facts as follows:

This is an appeal from a decree perpetuating an injunction against acts of continued trespass upon land. George B. Morton, a resident and citizen of Prince George's County, Maryland, and the Potomac Dredging Company of Baltimore, a corporation of the State of Maryland, filed their bill against the Columbia National Sand Dredging Company, a corporation of the State of Virginia, maintaining an office in the District of Columbia, and against Lewis E. Smoot, a resident of said District.  The bill alleges that George B. Morton is owner in fee simple of a certain tract of land known as Auburn, located on the southern side of Piscataway Creek, in Prince George's county, Maryland, and is entitled to the bed of said creek to the thread of the stream which forms the northern boundary thereof for a long distance, as appears from the original deed conveying said property to him, which is made an exhibit to the bill.  That some distance from the shore, but well

south of the thread of the creek, is a sand and gravel bar, attached at places to said shore, and short distances beyond this are other deposits of sand and gravel, which, by reason of the formation of the shore line, are gradually added to and form accretions to said shore, and all of which belong to said Morton. That for a valuable consideration said Morton had granted to the Potomac Dredging Company the exclusive privilege until May 1, 1909, of taking away said sand and gravel from said shore, and the said bar in front of said shore, and from the gravel flats attached thereto. That the said company made a channel up said creek, into said bar, and made it possible to come in contact with the said deposits of sand and gravel attached to and forming part of the said shore. That this sand and gravel is valuable for building purposes, and the said company can and does sell the same profitably in the District of Columbia, paying the said George B. Morton a fair sum for the privilege of taking the same. That, after the said company had at great expense made the channel for its use and benefit, the defendant corporation brought one of its dredging plants up said channel, and took large quantities of sand and gravel from the bar heretofore referred to as belonging to complainant, and continued same until complainant replevied some scow loads, so taken, which they were able to follow, though with much trouble. That within a few days past one of the dredging plants belonging to the defendant Smoot moved into the same position at the direction of defendants, and is now engaged in taking large and valuable quantities of sand and gravel heretofore referred to as belonging to complainants, though complainants have requested and warned them to desist. That the damage such wrongful taking has caused and will continue to cause complainants, though amounting to many hundred of dollars, is not susceptible of accurate or even approximate measurement, so as to make it possible for them to obtain adequate compensation in damages for the wrongful taking thereof, and will necessitate the institution of a large number of suits; and inasmuch as the damage is irreparable, and the quantities taken are so extremely difficult, if not impossible, to approximate, and

it is impracticable to follow and replevin the property taken and carried away, complainants aver that they should have an injunction to restrain the further taking of sand and gravel from the premises aforesaid.

The restraining order was granted, and on June 16, 1905, the defendants filed a joint answer in which they denied that the said Morton is entitled to any part of the bed of the said creek, and alleged that the northerly boundary line of his land is the high-water mark on the southerly margin of said creek, as appears from two deeds recorded among the land records of Prince George's county, whereunder the said Morton and his predecessors in title derived and obtained any and all right, title or interest which they, or any one of them, has or had in and to the land referred to in the bill. Copies of said deed and a plat of the land referred to are attached and made an exhibit. The defendants further answered that the said creek is a navigable water of the United States and a public river of the State of Maryland, and that the entire right and title to the bed thereof is in the State of Maryland, and not in the complainants or either of them as alleged; and they further denied that the sand and gravel bar described constitutes an accretion appurtenant to any land owned by the complainant Morton, and aver that he has no right or title to the same. They admit the taking of sand and gravel from the bar aforesaid, under a written permit and grant to defendants by the Secretary of War of the United States on April 14, 1903, the same being attached and made an exhibit to the answer. They further aver that the complainants instituted criminal proceedings against them, under an act of Maryland of March 3, 1900, providing that persons wilfully trespassing upon the lands of others should be subjected to fine or imprisonment, and caused agents and employees of defendant to be arrested and placed in jail in the State of Maryland, from which they were released on writs of habeas corpus issued out of the circuit court of Prince's George county, Maryland. They further aver that complainants brought a suit in equity against defendants in the circuit court

of Prince George's county, Maryland, on or about June 9, 1905, making substantially the same allegations and asking the same relief as in this bill, but that the same was dismissed by complainants on June 13, 1905, for the reason that the said court had declined to grant the preliminary injunction forbidding the defendants from dredging, taking, or removing sand and gravel from the sand and gravel bar hereinbefore mentioned. Upon this answer they moved to dissolve the restraining order, but the same was overruled and continued in force until final decree.

Testimony was then taken and resulted in a final decree, entered April 13, 1906, sustaining the bill and perpetually enjoining the defendants from taking and removing, by dredge or otherwise, sand and gravel or other materials from the bar or deposit of sand and gravel attached to the shore or in front thereof, and extending into and towards the center of Piscataway creek, in the State of Maryland, in front of and bounding on the farm known as Auburn, in Prince George's county in said State, belonging to George B. Morton.

No objection was taken, by pleading or otherwise, to the jurisdiction of the court in the premises, and the same was assumed and maintained without consideration. The appeal is from the decree on its merits.

When this case was called for hearing on appeal, no suggestion of want of jurisdiction was made by the appellants, but the court, of its own motion, declined to hear argument on the merits of the questions involved, until satisfied that the court below had jurisdiction of the subject-matter of the bill; and argument was required on the point. The submission was on that question, and none other.

*Mr. James H. Hayden* for the appellants.

*Mr. Enoch Harlan, Mr. George E. Hamilton, Mr. M. J. Colbert,* and *Mr. J. J. Hamilton* for the appellees.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

It is plain, from the allegations of the bill and answer, that the necessary question to be determined in the suit is whether George B. Morton has title to the sand and gravel bar lying wholly within the State of Maryland, either by deed conveying the title to the middle line of Piscataway creek, or, in case the boundary of the land conveyed thereby shall be confined to the shore of said creek, as an accretion to his land upon the shore. This is not only the principal, but substantially the only, question involved.

It is to the principal question involved in any case that we look to determine whether the action be local or transitory in its nature. If the principal fact carry with it the idea of some certain place, for example,—relates to land,—it is local, and the action must be maintained in the place where it is situated. If an action had been brought at law for a trespass upon the land in question, in removing sand and gravel therefrom, the supreme court of the District would clearly have had no jurisdiction. *Ellenwood* v. *Marietta Chair Co.* 158 U. S. 105, 39 L. ed. 913, 15 Sup. Ct. Rep. 771. In that case an action was brought in the circuit court of the United States for the district of Ohio, alleging continued acts of trespass upon the land of plaintiff in the State of West Virginia, as well as the cutting and removing therefrom of large quantities of timber. No question of the jurisdiction was made by the defendant, but the court of its own motion ordered the case stricken from the docket for want of jurisdiction. In affirming that judgment, the Supreme Court of the United States, speaking through Mr. Justice Gray, said:

"By the law of England and of those States of the Union whose jurisprudence is based upon the common law, an action for trespass upon land, like an action to recover the title or the possession of the land itself, is a local action, and can only be brought within the state in which the land lies.    *    *    *    The

original petition contained two counts, the one for trespass upon land, and the other for taking away and converting to the defendant's use personal property; and the cause of action stated in the second count might have been considered as transitory, although the first was not. \* \* \* But the petition as amended by the plaintiff on motion of the defendant, and by order and leave of the court, contained a single count alleging a continuing trespass upon the land by the defendant through its agents, and its cutting and conversion of timber growing thereon. This allegation was of a single cause of action, in which the trespass upon the land was the principal thing, and the conversion of the timber was incidental only, and could not, therefore, be maintained by proof of the conversion of personal property, without also proving the trespass upon real estate. *Cotton* v. *United States,* 11 How. 229, 13 L. ed. 675; *Eames* v. *Prentice,* 8 Cush. 337; *Howe* v. *Willson,* 1 Denio, 181; *Dodge* v. *Colby,* 108 N. Y. 445, 15 N. E. 703; *Merriman* v. *McCormick Harvesting Mach. Co.* 86 Wis. 142, 56 N. W. 743. The entire cause of action was local. The land alleged to have been trespassed upon being in West Virginia, the action could not be maintained in Ohio."

The contention that the doctrine of this case is impaired by the later case of *Stone* v. *United States,* 167 U. S. 178, 182, 42 L. ed. 127, 129, 17 Sup. Ct. Rep. 778, is untenable. As we have seen, it was said in the former case that if the cause of action had been confined to the recovery of timber removed from the land the action might have been considered as transitory. In the *Stone Case* the action was to recover the reasonable value of lumber and railroad ties manufactured from trees alleged to have been unlawfully cut by the defendant Stone from certain lands in Idaho belonging to the United States. The jurisdiction of the district court of the United States for the State of Washington, in which the suit was brought, was affirmed. Referring to the case of *Ellenwood* v. *Marietta Chair Co. supra,* Mr. Justice Harlan said: "But that case proceeded upon the theory that the allegations of the petition, at the time it was

tried, presented a single cause of action, in which the trespass upon the land was the principal thing, and the conversion of the property was incidental only, and therefore that the entire cause of action was local. In the present case the petition, it is true, avers that the United States was the owner of the lands from which the trees were cut, but the gravamen of the action was the conversion of the lumber and the railroad ties manufactured out of such trees; and a judgment was asked, not for the trespass, but for the value of the personal property so converted by the defendant. The description in the petition of the lands, and the averment of ownership in the United States, were intended to show the right of the government to claim the value of the personal property manufactured from the trees illegally taken from its lands. Although the government's denial of the ownership of the land made it necessary for it to prove its ownership, the action in its essential features related to .personal property, was of a transitory nature, and could be brought in any jurisdiction in which the defendant could be found and served with process. And a suit could have been brought to recover the property wherever it could be found. In *Schulenberg* v. *Harriman,* 21 Wall. 44, 64, 22 L. ed. 551, 555, it was said: 'The title to the land remaining in the State, the lumber cut upon the land belonged to the State. Whilst the timber was standing it constituted part of the realty; being severed from the soil its character was changed; it became personalty, but its title was not affected; it continued, as previously, the property of the owner of the land, and could be pursued whereever it was carried. All the remedies were open to the owner which the law affords in other cases of the wrongful removal or conversion of personal property.' "

The distinction between the two cases is thus clearly defined. It follows, therefore, that an action for trespass upon the land, involving necessarily and chiefly the question of its title, is local, and could only be brought in the jurisdiction wherein the land is situated. On the other hand, an action to recover the value of the sand and gravel severed from the land and removed

therefrom, though incidentally made to involve the question of title, could be maintained in the District of Columbia against parties found therein and personally served with process.

It is contended, however, that because the equity jurisdiction is rightfully invoked to restrain acts of continuing trespass upon the land, working injuries irreparable at law, as well as to prevent a multiplicity of suits, the difficulty with the action of trespass at law is obviated by reason of the principle that equity acts *in personam,* and not *in rem.* In other words, that the court of equity in this District, having jurisdiction of the persons of the defendants, may restrain them from committing acts of trespass upon lands in Maryland, notwithstanding the principal fact involved, and upon which the right to exercise the restraint depends, is that of title to the land. We cannot agree with this contention. From a very early period, courts of equity having jurisdiction of the person of a party have exercised the power to compel him to perform a contract, execute a trust, or undo the effects of a fraud, notwithstanding it may relate to or incidentally affect the title to land in another jurisdiction. The doctrine is thoroughly well established within this limitation, that the principal question involved must be one of contract, trust, or fraud, raising up a duty which a person within the power of the court may be compelled to perform, although the act when performed may operate to affect, and even to pass, the title to land outside the territorial jurisdiction of the court. As was said by Mr. Justice Field in *Pennoyer* v. *Neff,* 95 U. S. 714, 723, 24 L. ed. 565, 569: "Thus the State, through its tribunals, may compel persons domiciled within its limits to execute, in pursuance of their contracts respecting property elsewhere situated, instruments in such form and with such solemnities as to transfer the title, so far as such formalities can be complied with; and the exercise of this jurisdiction in no manner interferes with the supreme control over the property by the State within which it is situated. *Penn* v. *Baltimore,* 1 Ves. Sr. 444; *Massie* v. *Watts,* 6 Cranch, 148, 3 L. ed. 181; *Watkins* v. *Holman,* 16 Pet. 25, 10 L. ed. 873; *Corbett* v. *Nutt,* 10 Wall. 464, 19 L. ed. 976."

The leading case upon this question, to which reference is universally made, is that of *Penn* v. *Baltimore,* 1 Ves. Sr. 444, 2 White & T. Lead. Cas. in Eq. 4th Am. ed. 1806. The bill was filed in England, where both parties resided at the time, to compel specific performance of a contract entered into by them providing for the establishment of the boundaries of their respective grants of Pennsylvania and Maryland. In defining the grounds upon which he maintained jurisdiction in the case, Lord Hardwicke said: "This court therefore has no original jurisdiction on the direct question of the original right of the boundaries; and this bill does not stand in need of that. It is founded on articles executed in England under seal for mutual consideration, which gives jurisdiction to the King's court both of law and equity, whatever be the subject-matter.   *   *   * The conscience of the party was bound by this agreement; and being within the jurisdiction of this court,   *   *   *   which acts *in personam,* the court may properly decree it as an agreement, if a foundation for it."

The learned American editors in their notes to the above case (2 White & T. Lead. Cas. in Eq. 1830), after reviewing the American decisions, say: "It will be observed that in the foregoing cases the jurisdiction attached on the ground of the defendant's fraud or failure to perform some equitable obligation, irrespective of any question of title, and the decree was capable of being enforced against the person of the defendant. And although equity has no jurisdiction over naked questions of title to real estate, yet it will not refuse to determine a controversy which, in other respects, is within its jurisdiction, because it incidentally adjudicates upon the title to lands without its control. But these cases must not be confused with another and totally different class, wherein the validity of rights claimed under a disputed title to lands in other States becomes the primary question, and the decree depends upon the construction given. Here the relief will be refused unless under very peculiar circumstances, for to hold otherwise would be to try an ejectment through the medium of a court of chancery, governed by rules possibly differing from those in force where the

land is situate, and whose decree would be utterly ineffective
as to the subject-matter of the controversy."

And they further say, in conclusion: "The result of the case,
as a whole, would seem to be that, as the right of real prop-
erty is essentially local, and can only be enforced at law by a
recourse to the local tribunals, equity will follow the law, and
refuse to assume a power which might further the purposes of
justice in particular instances, but would ultimately disturb
the comity which ought to exist between the courts of different
nations, by bringing the decisions of former tribunals into con-
flict with those of the *locus rei sitæ.*   *   *   *   But rights
growing out of trust or contract, or founded upon a fraudulent
violation of the principles of equity as between man and man,
are purely personal, and will consequently be upheld and en-
forced, both by law and equity, whenever jurisdiction has been
acquired over the parties, without regard to the nature or situa-
tion of the property in which the controversy has its origin, and
even when the relief sought consists in a decree for the convey-
ance of land which lies beyond the control of the court, and can
only be reached through the exercise of its powers over the
person."

The question was first passed on by the Supreme Court of
the United States in *Massie* v. *Watts,* 6 Cranch, 148, 3 L. ed.
181, the opinion in which was delivered by Chief Justice Mar-
shall.  In that case a bill was filed by a citizen of Virginia in
the circuit court of the United States for the district of Ken-
tucky, against Massie, a citizen of Kentucky, to compel the lat-
ter to convey to the former 1,000 acres of land in the State of
Ohio, the defendant having obtained the legal title by fraud.
Complainant claimed the equitable title, and alleged certain
fraudulent surveys by the defendant, through which he had ap-
propriated complainant's land.  Appeal was taken from a final
decree establishing complainant's title and directing the defend-
ant to execute a conveyance to him for the land.  In affirming
that decree, the Chief Justice said on the question of jurisdic-
tion:

"Was this cause, therefore, to be considered as involving a naked question of title? Was it, for example, a contest between Watts and Powell, the jurisdiction of the circuit court of Kentucky would not be sustained. But where the question changes its character, where the defendant in the original action is liable to the plaintiff, either in consequence of contract, or as trustee, or as the holder of a legal title acquired by any species of *mala fides* practised on the plaintiff, the principles of equity give a court jurisdiction wherever the person may be found; and the circumstance that a question of title may be involved in the inquiry, and may even constitute the essential point on which the case depends, does not seem sufficient to arrest that jurisdiction."

After reviewing the English authorities, commencing with the case of *Penn* v. *Baltimore, supra,* he further said:

"Upon the authority of these cases, and of others which are to be found in the books, as well as upon general principles, this court is of opinion that, in a case of fraud, of trust, or of contract, the jurisdiction of a court of chancery is sustainable wherever the person be found, although lands not within the jurisdiction of that court may be affected by the decree." See also *Carpenter* v. *Strange,* 141 U. S. 87, 106, 35 L. ed. 640, 647, 11 Sup. Ct. Rep. 960.

The doctrine enounced has been followed by the same court ever since without question, for we cannot regard the case of *Phelps* v. *McDonald,* 99 U. S. 298, 25 L. ed. 473 (relied on by the appellants), either as furnishing an exception to it, or as extending its limitations. In that case the bill was filed in the supreme court of the District of Columbia by Phelps, who had regularly been appointed assignee in bankruptcy under proceedings in the district court of the United States for the southern district of Ohio, declaring McDonald a bankrupt. In the schedule of assets filed by the bankrupt was a brief statement of a claim against General Osborne, of the United States Army, and others, "for burning in January and February, 1865, from 1,000 to 2,000 bales of my cotton in Arkansas and Louisiana."

There was no further description of the claim except, that in a duplicate schedule filed in the office of the register, the amount is stated as 7,000 to 8,000 bales, and the claim there, with others, is designated as worthless. McDonald was duly discharged in bankruptcy on March 17, 1869. The assignee, having obtained an order to sell certain accounts, notes, and judgments of the bankrupt, sold them at public sale, including the claim aforesaid. One White became the purchaser of the uncollected accounts, and it is alleged that the purchase was made for McDonald with money furnished by him, and the claim transferred to him by White. It was then alleged that, prior to the filing of his petition in bankruptcy, McDonald had a just and valid claim against the United States for cotton destroyed by the Army, that, being a British subject (a fact concealed in describing the claim), although for many years a resident of this country, he prosecuted the claim before the joint British and American Commission organized under the treaty of May 8, 1871; that the claim was finally adjudged to be valid, and on September 23, 1873, the Commission awarded the sum of $197,- 190 to be paid in gold by the government of the United States to the government of Her Britannic Majesty, in respect of the above claim; that the United States had paid the money to the agent of the British government in the city of Washington, who was about to pay the same to McDonald. An injunction was prayed restraining McDonald and White, or either of them, from receiving said award, and for a decree that said fund be held in trust for the creditors of McDonald, and be subject to the complainant's rights as assignee in bankruptcy. Process was formally served on both defendants, and a temporary injunction was awarded. Subsequently, by consent of parties, a decree was made that one half of the amount of the award be received by the defendants to pay the expense of prosecuting the claim before the joint commission, and the other half placed in the hands of George W. Riggs, as receiver, to await the final action of the court; and that McDonald execute all orders, receipts, and acquittances necessary to enable the receiver to ob-

tain the fund. The defendants withdrew their answer, and filed a demurrer to the effect that the court below had no jurisdiction of the case, and upon other grounds relating to the rights of the complainant. The demurrer was sustained, the bill dismissed, and on appeal the decree was reversed. The opinion of the majority of the court was delivered by Mr. Justice Swayne, who said: "In this case, whether the money be here or abroad, the assignee is entitled to have the question finally settled whether he or McDonald has the better right. This court has twice decided that a British subject can sue the United States in the court of claims, because an American citizen is permitted to sue the British government by a petition of right. The act of Congress creating the court requires reciprocity. *United States* v. *O'Keefe,* 11 Wall. 178, 20 L. ed. 131; *Carlisle* v. *United States,* 16 Wall. 147, 21 L. ed. 426. If the claim of the assignee were presented to the British government by a petition of right, and the claim of McDonald was also presented, the parties, in the absence of any judicial determination, would doubtless be required to settle their controversy by interpleading, or in some other appropriate form of litigation. If the appellant shall be finally successful in this case, and the record should be presented with his petition, no such question could arise, and judgment in his favor must necessarily follow. Conceding the fund to be there, why should not the question of paramount right be settled in this case, rather than that the American claimant should be subjected to the delay, expense, and other inconveniences of a suit before a foreign tribunal? The adjudication would be as binding in one case as in the other. Where the necessary parties are before a court of equity, it is immaterial whether the *res* of the controversy, whether it be real or personal property, is beyond the territorial jurisdiction of the tribunal. It has the power to compel the defendant to do all things necessary, according to the *lex loci rei sitæ,* which he could do voluntarily, to give full effect to the decree against him. Without regard to the situation of the subject-matter, such courts consider the equities between the parties, and decree *in personam* according to those equities, and

enforce obedience to their decrees by process *in personam.* 2 Story Eq. sec. 899; *Miller* v. *Sherry,* 2 Wall. 249, 17 L. ed. 830; *Penn* v. *Baltimore,* 1 Ves. Sr. 444; *Mitchell* v. *Bunch,* 2 Paige, 606, 22 Am. Dec. 669."

Notwithstanding some of the language of the opinion, it is to be observed, as in *Massie* v. *Watts,* 6 Cranch, 148, 3 L. ed. 181, the case involved a fraud committed by the defendant in reobtaining the title; and, having jurisdiction of his person, the court could compel him to execute such an assignment as would be necessary to revest the title of the defrauded assignee in bankruptcy; and, the money having been voluntarily deposited in the custody of the court, it could be ordered paid to the established owner.

A recent case in the House of Lords of England carries the doctrine of jurisdiction by virtue of power over the person to a great length, but it was maintained because the bill sought the enforcement of a duty under a trust relating to the personal estate of a deceased testator. *Ewing* v. *Ewing,* L. R. 9 App. Cas. 34, 40.

In that case a testator domiciled in Scotland and possessed of a large personal estate in that country and a smaller one in England, by a will made in Scotch form, appointed six persons to be executors and trustees, three of whom resided in England and three in Scotland. The trustees obtained confirmation of the will in Scotland, and this was confirmed by the English court of probate. An infant legatee, resident in England, brought suit in England, through his next friend, for the administration of the estate, as one of the beneficiaries of the trust. Service was had upon all of the trustees, who entered appearance and obtained an order of reference to ascertain if the prosecution of the action would be for the infant's benefit. Upon this reference, the order for further prosecution was made, from which no appeal was taken. Before the action came to trial, the trustees removed all of the English personalty to Scotland. It was held that the English court had jurisdiction to administer the trusts of the will as to the whole estate,

and that, as no proceedings were pending in Scotland by which the interest of the infant would have been clearly protected, the jurisdiction was not discretionary, but that the decree was a matter of course.

Lord Chancellor Selborne said: "A jurisdiction against trustees which is not excluded *ratione legis rei sitæ* as to land cannot be excluded as to moveables because the author of the trust may have had a foreign domicil; and for this purpose it makes no difference whether the trust is constituted *inter vivos*, or by a will, or *mortis causa* deed. Accordingly it has always been the practice of the English Court of Chancery * * * to administer, as against executors and trustees personally subject to its jurisdiction, the whole personal estate of testators or intestates who have died domiciled abroad, by decrees like that now in question. The appellants' counsel were not able to produce any precedent for an administration decree limited (where there was a general probate and a general trust) to assets locally situate within the jurisdiction. * * * The English jurisdiction was sustained on the same principle in *Johnstone* v. *Beattie,* 10 Clark & F. 42, 84. If English trustees, having in their hands English trust funds, were found within the jurisdiction of the Scottish courts, those courts, upon the same principle, might compel them to do their duty. *Ferguson* v. *Douglas,* 3 Paton, 503, 510."

In another recent English case, the facts of which are analgous to those of the case at bar, the court distinguished the decision in *Ewing* v. *Ewing* (rendered in the chancery division, and not then decided on appeal), and expressly maintained the limitation of the equity jurisdiction acting *in personam,* that we have here attempted to point out. *Graham* v. *Massey,* L. R. 23 Ch. Div. 743.

That suit was brought to recover three fourths of one moiety of the purchase money of a house in Dresden, Saxony, sold by Charles Stewart Hawthorne, the testator. The defendants were his executors and devisees in trust. The house originally belonged to Colonel Hawthorne, a domiciled Irishman, and his

wife, Sarah, jointly.  By his will dated in 1851, he gave his
real and personal estate, which would include his moiety of the
house, to trustees in trust to pay the rents, profits, etc., to his
wife, Sarah, for life, and, after her death, upon trust for his
daughter Mabella.   This will was not executed according to
Saxon law.  Colonel Hawthorne left his widow and a daughter,
Georgiana, surviving; his daughter Mabella having died in his
lifetime.  The widow died on the 31st of May, 1875, leaving a
will executed according to Saxon law, by which she devised all
her real and personal property at her residence in Dresden,
including this house, to Charles Stewart Hawthorne.  In 1875
he sold the house, received part of the purchase money, and
the remainder was secured to him by a mortgage of the house,
according to Saxon law.  He died in 1877.  The plaintiffs in
this action were the administrator and the widow and children
of John Graham, the surviving husband of Georgiana.  It was
allged in effect, that on the death of Colonel Hawthorne one
moiety of the house, subject to his widow's life interest, de-
volved by Saxon law, as to three-fourths part, on Georgiana,
and the remaining one fourth on Sarah Hawthorne, who was
entitled to the other moiety, and that on the death of Georgiana,
in 1863, John Graham became by Saxon law entitled to her
three fourths of one moiety, and that he died intestate.  Plain-
tiffs, as his administrator and next of kin, respectively, claimed
three fourths of one moiety of the purchase money, with inter-
est, against the estate of Charles Stewart Hawthorne.  It was
also alleged that, on the death of Sarah Hawthorne, Charles
Stewart Hawthorne procured himself to be registered in Dres-
den as the owner of the house, and so became the legal owner;
and that by Saxon law he could confer an indefeasible title on a
purchaser; but that a seller, under such circumstances, became
by the law responsible to the person really entitled, if he had
acted bona fide, for the purchase money of which he became a
trustee for the person really entitled.   The defense denied ut-
terly the claims of the plaintiffs, and alleged that Charles Stew-
art Hawthorne was sole and legal owner of the entirety of the

house for his own use and benefit, and submitted that the rights
of the parties to this action ought to be determined in the courts
of Saxony.  Kay, Justice, said:

"An important question of jurisdiction arises in this case.
\* \* \* It is obvious that neither Charles Stewart Haw-
thorne nor the defendants is or are, with reference to this claim,
by English law, in any fiduciary relation to the plaintiffs.  They
are not bound by contract with them.  Nor is the claim in
any way based upon a suggestion of fraud.  It is a bona fide
claim, on both sides, of title to land, or the proceeds of land,
in Saxony.  The claim depends primarily upon the law of
Saxony as to the devolution of land in that country.  If main-
tainable, it can only be so upon the ground that, by the law of
Saxony, upon the death of Sarah Hawthorne three fourths of
one moiety of this property descended to Georgiana Hawthorne,
under whom the plaintiffs claim.  The next question is whether
the plaintiffs, by the law of Saxony, are entitled to such inter-
est, if any, as did so descend to Georgiana Hawthorne.  A third
question is whether, by Saxon law, Charles Stewart Hawthorne
having sold the property, he, or his estate after his death, is ac-
countable for a share of the purchase money to the plaintiffs.

After discussing the uncertainty of determining a question
purely of foreign law, the court said: "I am not aware of any
case where a contested claim depending upon the title to im-
movables in a foreign country, strictly so called, being no part
of the British dominions or possessions, has been allowed to
be litigated in this country simply because the plaintiff and
defendant happened to be here.  Lord Mansfield, in *Mostyn*
v. *Fabrigas,* 1 Cowp. 161, 176, distinguished such a case from
those in which actions might be brought here.  He said: 'So, if
an action were brought relative to an estate in a foreign coun-
try, where the question was a matter of title only, and not of
damages, there might be a solid distinction of locality.'  The
cases cited in the argument were such as the enforcement in
England of an equitable mortgage made in England concern-
ing Scotch land, where the court gave relief, treating the rem-

edy as in the nature of specific performance, when the court acts *in personam. Ex parte Pollard,* Mont. & C. Bankr. 239. There is no doubt of the jurisdiction in such a case, and the courts will even foreclose an English mortgage of foreign land (*Toller* v. *Carteret,* 2 Vern. 494); the foreclosure decree being, as Vice Chancellor Bacon pointed out in *Paget* v. *Ede,* L. R. 18 Eq. 118, merely an extinction of the right to redeem, as was said also by Lord Cranworth in *Colyer* v. *Finch,* 5 H. L. Cas. 905, 915. In *Norris* v. *Chambres,* 29 Beav. 246, Lord Romilly distinguished the case of a foreign mortgage of foreign land, where no relief would be given by English courts. There is a class of cases in which jurisdiction as to land in the colonies has been maintained on the ground of fraud, like *Cranstown* v. *Johnston,* 3 Ves. Jr. 170. It is not pretended that there was any fraud in the present case. Perhaps the decision that goes furthest in the plaintiff's favor is the recent case of *Re Ewing,* L. R. 22 Ch. Div. 456. There a legatee under a Scotch will or trust deed was allowed to maintain an action for administration against the executors, who had proved in England, three of whom were in this country, and the others had been served in Scotland, without objection. The usual administration order was made, though there were no assets in England; but the late master of the rolls and Lord Justice Cotton both pointed out that the plaintiff's claim was undisputed; and the master of the rolls repudiated the notion that Scotland is a foreign country for the purpose of such a question of jurisdiction. According to *Enohin* v. *Wylie,* 10 H. L. Cas. 1, if the claim had been contested, and had involved a disputed question of the construction of a Scotch will, it may be doubted if a decree could properly have been made. But the case is infinitely stronger where the contested claim is based upon the right to land, where the land is situate, not in Scotland, but in Dresden, where the question whether the plaintiff has any claim or not must be determined by the law of Saxony as to immovables, and where the only ground for instituting proceedings in this country is the fact that the defendants are resident here. All these circumstances concur in this case, and in my opinion the courts of

civil judicature in England, which sit, as Lord Westbury said in *Cockney* v. *Anderson*, 1 De G. J. & S. 365, to administer the municipal law of this country, have no authority to determine in such a case as this whether or not the plaintiff's claim is well founded, and I must, therefore, dismiss this action."

We have stated the facts of the case and quoted from the opinion at length, because it appears to us substantially to determine the question that is presented here. There is no allegation of contract, trust relation, or fraud, on which the jurisdiction may be based. The essential question involved is whether the complainant Morton is the owner of the sand and gravel bar, either by virtue of a deed carrying his boundary to the middle line of Piscataway creek, in Maryland, or, if not, by reason of its being a navigable stream, as an accretion to his adjacent shore land. The effect of the decree is to establish his title by a perpetual injunction against the acts of trespass complained of; and this question of title is determinable by the laws of Maryland alone.

We will not extend an opinion already too long, by reviewing the several State cases cited on behalf of the appellants. It is sufficient to say of many of these that they related to lands lying in different counties in the same state, and depended in part, at least, upon local statutes defining the jurisdiction of the courts. Others, which go very far in the direction contended for,—*Schmaltz* v. *York Mfg. Co.* 204 Pa. 1, 59 L.R.A. 907, 93 Am. St. Rep. 782, 53 Atl. 522; *Clad* v. *Paist*, 181 Pa. 148, 37 Atl. 194; *Jennings Bros.* v. *Beale*, 158 Pa. 283, 27 Atl. 948; *Alexander* v. *Tolleston Club*, 110 Ill. 65, 77; *Carroll* v. *Lee*, 3 Gill. & J. 504, 510, 22 Am. Dec. 350, being the principal ones,—involve the construction and enforcement of contracts or a trust. *Keyser* v. *Rice*, 47 Md. 203, 28 Am. Rep. 448, maintains the right of the courts of equity of the State to enjoin one of its citizens from prosecuting a suit in another State, violative of the laws of Maryland, and affecting the rights of another citizen of the same State. The same doctrine is upheld by the Supreme Court of the United States, but stands upon a ground

very different from that of the present case. *Cole* v. *Cunningham,* 133 U. S. 107, 33 L. ed. 538, 10 Sup. Ct. Rep. 269. In another case cited, the same principle is applied, though to a different state of facts. *Great Falls Mfg. Co.* v. *Worster,* 23 N. H. 462. Complainant maintained a dam extending across the Salmon river, from the shore in New Hampshire to the shore in the State of Maine. The defendant, a citizen of New Hampshire and served with process therein, owned lands on each side of the river that were overflowed by reason of complainant's dam. He removed a portion of the dam, and threatened to lower it further. The bill prayed that he might be enjoined from destroying any part of the dam, or from meddling with it in any way. An objection to the jurisdiction was overruled, and the decree granting the injunction was affirmed. In the discussion of the question it was said: "The court are not asked to assume any jurisdiction or exercise any control over the land in Maine, or to interfere with the laws of that State. Nothing more is asked than that the respondent, a citizen of New Hampshire and residing within her limits, shall be subject to her laws; and that, being within reach of the process of this court, he shall be forbidden to go elsewhere and commit injury to the property of other citizens, situated here and entitled to the protection of our laws."

Entertaining the opinion that the court below was without jurisdiction of the subject-matter of the suit, we must reverse the decree appealed from, and remand the cause with direction to dismiss the bill. It is so ordered.

*Reversed and dismissed.*

*Mr. J. J. Hamilton* on the 19th day of November 1906, for the appellees, filed a motion to reform the decree of this court.

The Court, acting upon this motion, on November 28, 1906, handed down the following opinion written by Mr. Chief Justice SHEPARD:

The opinion of the court in reversing this case is silent in respect to the question of costs, and the entry of the decree therefor against the appellees was in accordance with the general provision of section 3 of rule 18.   The appellees have filed a motion to reform that decree so as to show a reversal without costs to either party.   The contention that there should have been no decree for costs, as against either party, because the dismissal of the appeal was for want of jurisdiction in the court below, as governed by section 1 of rule 18,* is untenable.   That section applies in those cases where the appellate court has no jurisdiction whatever.   When the appeal is from a decree rendered by a trial court without jurisdiction in the premises, the rule is different.   In such a case the appellate court has jurisdiction of the appeal for the purpose of reversing the erroneous judgment.   *Mansfield, C. & L. M. R. Co.* v. *Swan,* 111 U. S. 379, 387, 28 L. ed. 462, 465, 4 Sup. Ct. Rep. 510; *Hancock* v. *Holbrook,* 112 U. S. 229, 232, 28 L. ed. 714, 715, 5 Sup. Ct. Rep. 115; *Graves* v. *Corbin,* 132 U. S. 571, 590, 33 L. ed. 462, 468, 10 Sup. Ct. Rep. 196; *North American Transp. & T. Co.* v. *Morrison,* 178 U. S. 262, 269, 44 L. ed. 1061, 1064, 20 Sup. Ct. Rep. 869.

The entry of the decree was therefore clearly within the power of this court under section 3 of rule 18.   That section of the rule provides that, in case of reversal, costs shall be awarded to the appellants, "unless otherwise ordered by this court."   The complainants were undoubtedly at fault in bringing the suit in a court without jurisdiction.   The defendants, appellants here, tacitly conceded the jurisdiction of the court below, and were apparently as anxious, on account of convenience, to have the case tried thereon on its merits as were the complainants.   They made no suggestion of want of juris-

---

*Section 1 of rule 18 is as follows:

"1. In all cases where appeals shall be dismissed by this court, except where dismissal shall be for want of jurisdiction, costs shall be allowed to the appellee, unless otherwise agreed by the parties."—Reporter.

diction at any stage of the proceeding, and the point naturally passed unnoticed by that court. From the decree against them on the merits they appealed to this court, and again failed to suggest the want of jurisdiction. On this appeal, when the argument was begun on the merits, the court of its own motion suggested the probable want of jurisdiction in the court below, and refused to hear the argument until that question could be determined. The result of the suggestion was the conclusion that the court below had no jurisdiction of the case, and that necessarily its decree must be reversed, with direction to dismiss the bill. Now, had the appellees raised the question of jurisdiction below, and brought it up as a ground of appeal, there would be no question of their right to recover costs in this court. We must presume, however, that, had the suggestion of want of jurisdiction been made in the court below, it would have prevailed. The result of the failure to raise the question of jurisdiction has been the taking of testimony at considerable expense and a great increase in the volume of the transcript of the record. As the appellants were at fault in the respects indicated, and brought the case here upon the merits alone, we now think it just that each party shall pay the costs incurred by him. Having the power, under section 3 aforesaid, to make such an order, the decree will be *reformed so as to require each party to pay the costs incurred by him in this court. It is so ordered.*