701 So.2d 1170 (1997)
BRADENTON GROUP, INC. and Eight Hundred, Inc., Appellants,
v.
DEPARTMENT OF LEGAL AFFAIRS, STATE OF FLORIDA, Appellee.
Nos. 96-2661, 96-2979.
District Court of Appeal of Florida, Fifth District.
October 3, 1997.
Rehearing Denied December 10, 1997.
*1171 Thomas F. Egan, of Thomas F. Egan, P.A., Orlando, for Appellants.
Jacqueline H. Dowd, Assistant Attorney General, Orlando, for Appellee.
GRIFFIN, Chief Judge.
This is the consolidated appeal of two interlocutory orders rendered by the trial court in an action filed by the state against Bradenton Group, Inc. and Eight Hundred, Inc. [collectively, "the defendants"]. The defendants appeal an order denying their motion to dissolve an injunction obtained against them by the state. The state appeals a subsequent order requiring it to post a $1.4 million bond. This appeal raises a number of issues concerning the relationship between sections 895.01-.06, Florida Statutes ("RICO"),[1] in particular section 895.05, Florida Statutes ("civil RICO"), and section 849.09, Florida Statutes ["the lottery statute"], *1172 and section 849.0931 ("the bingo statute"). For the reasons set forth below, we affirm both orders.
The defendants are for-profit Florida corporations who own or operate a number of properties throughout central Florida at which bingo is or was conducted. In November, 1995, the state filed in the Orange County circuit court a civil complaint against the defendants and several other corporations and individuals. The complaint sought relief under civil RICO based on alleged violations of section 895.03, Florida Statutes (1995). The RICO violations were based on some fifty-four alleged predicate acts, all consisting of violations of the lottery statute. The complaint sought forfeiture pursuant to subsection 895.05(2) of two parcels of real property, one located in Pinellas County and the other in Manatee County, as well as personal property, namely money, and other unknown property derived from proceeds gained from the defendants' alleged criminal activities. At the same time, the state also initiated a companion criminal case against the defendants based on the same alleged RICO violations, the result of an indictment by a statewide grand jury.
Filed simultaneously with the civil complaint was a motion to enter a temporary injunction against the defendants without notice and without bond. The motion was accompanied by the affidavit of a financial investigator, Larry Schuchman. On November 6, 1995, the trial court granted the motion and entered a temporary injunction against the defendants without notice. The court's order enjoined the defendants and their officers, agents, and employees, from violating the lottery statute and ordered them to cease and desist from conducting bingo games at a number of the defendants' properties, including the properties in Manatee and Sarasota counties. The court also ordered that the defendants' personal property, including numerous bank accounts, was subject to immediate court supervision and that the defendants could not dispose of, transfer, relocate, conceal or in any way alter the status of that property without prior approval of the court. The order did not make reference to a bond.
On November 21, 1995, the defendants filed a motion to dissolve the temporary injunction on a number of grounds, including that the court lacked subject matter jurisdiction in the cause, that the complaint and affidavit attested only to bingo infractions which did not constitute predicate acts of racketeering under RICO, and that the state had failed to meet the necessary criteria for a temporary injunction. The defendants also filed the sworn affidavit of their accountant, who averred that the injunction encompassed all of the defendants' real property and all of the defendants' business and operating accounts. The affidavit stated that if the accounts were not unfrozen, the defendants would be forced to default on mortgage, tax and other obligations, resulting in losses of approximately $3,000,000. On January 11, 1996, the defendants filed a motion to require the state to obtain an injunction bond.
For reasons unexplained by the parties, the defendants' motion to dissolve the injunction was not heard until May 22, 1996. Apparently, no record of this hearing was made. Subsequently, on September 3, 1996, the trial court denied the defendants' motion to dissolve. The defendants then instituted their appeal in case number 96-2661.
The defendants' motion to require a bond was heard on October 10, 1996. At the conclusion of the hearing, the trial court ordered the state to post a $1.4 million bond in order to continue the injunction. The state then instituted its appeal in case number 96-2979.
The state's appeal automatically stayed the order requiring it to post a bond.[2] Subsequently, the defendants sought and obtained an order from the trial court which vacated the stay. On February 7, 1997, the trial court advised the parties that it would dissolve the injunction if the state failed to post the required bond by 5 p.m. on February 12, 1997. The state then filed an emergency writ in this court, case number 97-324, seeking to have the trial court prohibited from dissolving the injunction. This court responded by entering a constitutional writ staying all proceedings in the lower court's *1173 case and, in consideration of this order, dismissed the petition.

I. Subject Matter Jurisdiction.
A threshold issue is whether the circuit court lacks subject matter jurisdiction in this case. The defendants contend that under the "local action rule" the trial court lacked subject matter jurisdiction since certain property the state seeks to have forfeited is not located within the circuit court's territorial jurisdiction.
The common law recognizes that certain actions are local in nature and may be maintained only in a court that has jurisdiction over the res. Hence, under the "local action rule," a court in equity has no power, and, accordingly, no jurisdiction, to render a decision directly operating on real property outside the court's own territorial limits. See Goedmakers v. Goedmakers, 520 So.2d 575, 578-79 (Fla.1988); Publix Super Markets, Inc. v. Cheesbro Roofing, Inc., 502 So.2d 484, 486-87 (Fla. 5th DCA 1987); McMullen v. McMullen, 122 So.2d 626, 630 (Fla. 2d DCA 1960). The recognized judicial shorthand for determining when the local action rule is effective in a given case is an examination of the character of the cause: if the action is in personam, the rule does not apply; if the action is in rem, it does. See State, Dep't of Natural Resources v. Antioch Univ., 533 So.2d 869, 872-73 (Fla. 1st DCA 1988); Board of Trustees of the Internal Improvement Trust Fund v. Mobil Oil Corp., 455 So.2d 412, 415 (Fla. 2d DCA 1984), approved in part and quashed in part on other grounds, 492 So.2d 339 (Fla.1986).
Although the injunction in this case affects defendants' properties, it is an equitable device requiring only personal jurisdiction over the defendants. The tangential involvement of property located outside the trial court's territorial jurisdiction does not make the issuance of this injunction an in rem proceeding which necessitates compliance with the local action rule. See Goedmakers, 520 So.2d at 579; Antioch University, 533 So.2d at 872; Publix, 502 So.2d at 486. As the supreme court has stated:
From a very early period, courts of equity having jurisdiction of the person of a party have exercised the power to compel him to perform a contract, execute a trust, or undo the effects of a fraud, notwithstanding it may relate to or incidentally affect the title to land in another jurisdiction.
Lakeland Ideal Farm & Drainage Dist. v. Mitchell, 97 Fla. 890, 895, 122 So. 516, 518 (1929) (quoting Columbia Nat'l Sand Dredging Co. v. Morton, 28 App. D.C. 288, 7 L.R.A. (N.S.) 114 (1906)).

II. Propriety of Injunction.
The defendants follow their jurisdictional argument with multiple attacks on the sufficiency of the injunction and the lower court's refusal to dissolve it on various procedural or technical grounds. The defendants concede that no transcript exists from the hearing on their motion to dissolve, but they insist that their complaints concern only issues of law which are reviewable despite this deficiency. We find that these complaints lack substantial legal merit, were not raised below or lack record support and, accordingly, we reject them without extended discussion. See § 895.05(5) Fla. Stat. (1995).[3]

III. Can Unauthorized Bingo Constitute a Violation of the Lottery Law and, Thus, Be "Racketeering Activity"?
The key issue we address concerns whether the state has alleged the violation of crimes which constitute predicate acts under RICO. At its essence, the defendants' argument is that violations of the bingo statute, section 849.0931, Florida Statutes, cannot be "racketeering activity" under Florida RICO, *1174 sections 895.01-.06. In a sense, this is correct, but we believe it is not dispositive of the issue on appeal.
In its five-count amended complaint, the state alleged that the defendants, who along with other persons and entities not parties to this appeal comprised an enterprise, committed a series of violations of Florida's RICO law. The predicate acts underlying the racketeering charges were listed as 54 violations of the lottery statute, section 849.09, Florida Statutes, carried out by the defendants over a two-year period from 1994 through 1995. These were specified in the amended complaint.
a. The purported charities on whose behalf the games were conducted did not qualify as "charitable, nonprofit or veterans organizations" as defined in Section 849.0931(1)(c), Florida Statutes.
b. Jackpots were awarded which exceeded $250, in violation of Section 849.0931(5), Florida Statutes.
c. Bingo games were conducted on behalf of a particular purported charity on more than two days per week, in violation of Section 849.0931(6), Florida Statutes.
d. More than three jackpots were awarded on one day of play, in violation of Section 849.0931(7), Florida Statutes.
e. Persons involved in the conduct of bingo games were not bona fide members of the purported charity sponsoring the games, in violation of Section 949.0931(8), Florida Statutes.
f. Some of the purported charities involved in the conduct of bingo games were not located in the county, or within a 15-mile radius of where the bingo games were conducted, in violation of Section 849.0931(9), Florida Statutes.
g. Bingo games were not held on premises where authorized bingo games are permitted, in violation of Section 849.0931(11), Florida Statutes.
h. The bingo games were not conducted in accordance with the rules set forth in Section 949.0931(12), Florida Statutes; and
i. The proceeds of the bingo games were not returned to the players in the form of prizes, in violation of Section 849.0931(3), Florida Statutes.
The state's complaint concluded that the defendants' illegal operation of bingo games constituted a series of illegal lotteries in violation of the lottery statute and Florida RICO.
Transparently, what drives the state's theory of prosecution in this case is that bingo statute violations are not identified among the statutes listed as "racketeering activity" under subsection 895.02(1)(a) of the Florida RICO statute, but violations of section 849.09, the lottery statute, are listed. § 895.02(1)(a)32, Fla. Stat. (1995). The defendants perceptively argue that the state has attempted to bootstrap bingo offenses into lottery offenses in order to create a RICO violation. They urge that the courts should not be receptive to artful pleading when establishing RICO predicate acts of racketeering. State v. Sun City Oil Co., 522 So.2d 474 (Fla. 5th DCA 1988) and State v. Kessler, 626 So.2d 251 (Fla. 4th DCA 1993), review denied, 634 So.2d 627 (Fla.1994). However contrived the state's theory, it either succeeds or fails on the question whether any of the allegations of illegal activity set forth in the complaint constitute a violation of the lottery law.
Basic to defendants' argument that bingo law violations cannot be lottery law violations is the fact that the bingo statute has its own provision for criminal punishment for violators. Subsection (13) of the bingo statute provides:
Any organization or other person who willfully and knowingly violates any provision of this section is guilty of a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083. For a second or subsequent offense, the organization or other person is guilty of a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
§ 849.0931(13), Fla. Stat. The defendants also rely on the following language found in the lottery statute:
(3) Any person who is convicted of violating any of the provisions of paragraph (e), paragraph (f), paragraph (g), paragraph (i), or paragraph (k) of subsection (1) is guilty *1175 of a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083. Any person who, having been convicted of violating any provision thereof, thereafter violates any provision thereof is guilty of a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084. The provisions of this section do not apply to bingo as provided for in s. 849.0931.

§ 849.09(3), Fla. Stat. (emphasis added). The defendants urge that the highlighted portion of this provision means that violations of the bingo statute are expressly excepted from punishment under the lottery statute.
In order to discern the meaning of the bingo exception in the lottery statute, this court has attempted to examine the history and development of bingo law in this state and of the bingo statute in particular. This exercise has led us to a different understanding of this statute from the one put forth either by the state or by the defendants.

a. What is Punishable Under the Bingo Statute?
Originally enacted as section 849.093, Florida Statutes (1967), for nearly three decades the bingo statute has cloaked certain organizations with an exemption from much of chapter 849, "Gambling." This is accomplished through subsections (2)(a), (3) and (4) of that statute. Paragraph (2)(a) provides:

None of the provisions of this chapter [Ch. 849, entitled "Gambling"] shall be construed to prohibit or prevent charitable, nonprofit, or veterans' organizations engaged in charitable, civic, community, benevolent, religious, or scholastic works or other similar endeavors, which organizations have been in existence and active for a period of 3 years or more, from conducting bingo games, provided the entire proceeds derived from the conduct of such games, less actual business expenses for articles designed for and essential to the operation, conduct, and playing of bingo, are donated by such organizations to the endeavors mentioned above. In no case may the net proceeds from the conduct of such games be used for any other purpose whatsoever. The proceeds derived from the conduct of bingo games shall not be considered solicitation of public donations.
§ 849.0931(2)(a), Fla. Stat. (emphasis added). Subsection (3) extends the right to conduct bingo games to organizations not engaged in charitable or similar endeavors so long as all of the proceeds from the games are returned to the players as prizes,[4] and subsection (4) extends this right to condominium and like associations so long as the net proceeds are returned as prizes or donated to particular organizations after the deduction of certain actual business expenses. Under the plain language of the statute, only organizations meeting the criteria of either subsection (2)(a), (3) or (4) are authorized to conduct bingo and are correspondingly exempt from prosecution under the remaining portions of chapter 849.
Once the statute answers the question of who may conduct bingo as an exception to the normal reach of the gambling laws, the remainder of the bingo statute is a catalogue of detailed rules concerning the manner in which these bingo games must be operated. For example, subsection (5), one of the provisions which the defendants are charged with violating, provides:
(5) No jackpot shall exceed the value of $250 in actual money or its equivalent, and there shall be no more than three jackpots in any one session of bingo.
§ 849.0931(5), Fla. Stat. Other portions pertain to such things as how often games may be conducted, where they must be conducted, what must happen when a player calls out "bingo!", etc. Finally, subsection (13) provides criminal penalties for violations of "any provision of this section," as previously quoted.
*1176 The state's interpretation of this statute is this: bingo is a lottery, and in order for an organization to be eligible to conduct bingo, it must comply with each and every provision in the bingo statute or else lose its exemption from chapter 849 and thereby violate the prohibition against lotteries. No case has held such and we think the state draws too much from certain cases which generally referred to the bingo "exception" from chapter 849 as existing when bingo is conducted in compliance with the bingo statute. Greater Loretta Improvement Ass'n v. State ex rel. Boone, 234 So.2d 665 (Fla.1970); Paskind v. State ex rel. Salcines, 390 So.2d 1198 (Fla. 2d DCA 1980); Madar v. State, 376 So.2d 446 (Fla. 4th DCA 1979); North Bay Village Lions Found., Inc. v. City of Miami Beach, 338 So.2d 236 (Fla. 3d DCA 1976), cert. denied, 346 So.2d 1249 (Fla.1977); Perlman v. State, 269 So.2d 385 (Fla. 4th DCA 1972). We hold that violation of the various regulations contained in the bingo statute by an entity authorized to conduct bingo is not a violation of the lottery law.
Subsections (2)(a), (3) and (4) of the bingo statute specifically designate a series of conditions which, if met, authorize an organization to conduct bingo notwithstanding the gambling prohibitions found throughout the remainder of chapter 849. Nowhere in that statute is that right withdrawn under any circumstances. If, for example, an authorized organization conducts a bingo game and, in violation of subsection 849.0931(12)(d), fails to visibly display a number both after it is drawn and before being placed in the rack, it may have violated that particular statutory provision, but it has not lost what the legislature bestowed upon itthe right to conduct bingo games. The offending organization may be prosecuted under subsection (13) for violating a provision of the bingo statute, but it would not be subject to the various gambling proscriptions found throughout chapter 849.
Alternatively, if an organization not meeting the criteria for eligibility to conduct bingo earned money for itself by conducting a bingo game, that organization would not qualify under the statute for the right to conduct bingo and would lack the immunities to which it would have been entitled had it met the necessary criteria. See Madar v. State, 376 So.2d at 448. This is the defendants' status, according to the complaint and affidavit. In short, under our statutory scheme, they who are authorized to conduct bingo violate the bingo statute; they who are not authorized to conduct bingo do not violate the provisions of the bingo statute, they violate the applicable gambling laws. Reading section 849.0931 in pari materia with the multitude of gambling offenses proscribed throughout chapter 849, it is reasonable to conclude that the legislature intended the bingo requirements to govern the performance of authorized bingo;[5] it is not, however, the statutory vehicle for punishing unauthorized bingo operators.[6]

b. Is Bingo a Lottery?
Despite the erroneous conclusion present in the state's complaint and affidavit that violations of the bingo statute equate with violations of the lottery statute, those documents do allege that the defendants engaged in unauthorized bingo and that such conduct amounted to lottery statute violations. With this contention, we are bound to agree.
Although the Florida legislature has banned "lotteries" through section 849.09 and its predecessors since 1868, it has never attempted to define that term. The state constitutions *1177 of 1868, 1885, and 1968 also prohibited lotteries, but again none defined the term. See Fla. Const. art. X, § 7 (1968); Fla. Const. art. III, § 23 (1885); Fla. Const. art. IV, § 20 (1868). Any definition of lottery must therefore be gleaned from our case law.
One of the earliest reported lottery cases was Lee v. City of Miami, 121 Fla. 93, 163 So. 486 (1935). In Lee, the court was faced with a citizen's challenge that a statute passed by the legislature which authorized the licensing and regulation of slot machines violated the prohibition against lotteries found in the 1885 constitution.[7] The court observed lotteries to be a species of gambling and, identifying the mid-nineteenth century atmosphere that produced a nationwide movement against them, found the motivations behind Florida's lottery prohibition well expressed by the United States Supreme Court:
Experience has shown that the common forms of gambling are comparatively innocuous when placed in contrast with the wide-spread pestilence of lotteries. The former are confined to a few persons and places, but the latter infests the whole community: it enters every dwelling; it reaches every class; it preys upon the hard earnings of the poor; it plunders the ignorant and simple.
121 Fla. at 100, 163 So. at 489 (quoting Phalen v. Virginia, 49 U.S. (8 How.) 163, 168, 12 L.Ed. 1030 (1850)). The Lee court observed that Florida's legislature, through both its statutes and the constitutions, had historically distinguished between lotteries and gambling. The court held that the constitutional prohibition against lotteries was intended to suppress lotteries as referred to in Phalen, "the primary test of which was whether or not the vice of it infected the whole community or country, rather than individual units of it." 121 Fla. at 103, 163 So. at 490. Applying this definition to the slot machines authorized by the legislature, the Lee court concluded that the machines did not constitute lotteries per se. The court added, however, that perhaps "some of them, or possibly all of them in their operation, will become such," but the court left that determination for another day. Id.
Another slot machine case was presented to the court in Hardison v. Coleman, 121 Fla. 892, 164 So. 520 (1935). Hardison owned a slot machine and was arrested for setting up and conducting a lottery in violation of the immediate predecessor to section 849.09. Claiming he had broken no law, Hardison applied to the supreme court for a writ of habeas corpus. The court conceded that the machine was a gambling device, but explained, "It may be true that every lottery is a game or gambling device, but it does not follow that every game or gambling device is a lottery within the meaning of section 23, article 3, of the Constitution of 1885." 121 Fla. at 896, 164 So. at 522. Returning to Lee, the court said:
In that case the court places its interpretation upon the word "lotteries," as used in the Constitution, and limits the meaning of the word as there used to such gambling devices or methods which because of their wide or extensive operation a whole community or country comes within its contaminating influence; a scheme having the elements of advertising or sale to any individual of tickets and public distribution and division of prizes according to the numbers upon a ticket previously sold which entitled the owner to participate in a drawing or distribution of prizes to be made at a date in the future.
121 Fla. at 900, 164 So. at 524. The court found no reason to recede from Lee, and, applying the constitutional definition of lottery to the lottery statute's predecessor, section 7667, C.G.L., concluded that Hardison had neither set up nor conducted a lottery within the meaning of the statute.[8]
*1178 The supreme court's opinion in Hardison demonstrated an intent to construe both the constitutional and the statutory references to lotteries alike. The court would later reinforce this synonymy in Jarrell v. State, 135 Fla. 736, 185 So. 873 (1939), when it explained that the legislative purpose of the lottery statute was "to effectuate the provision of the constitution that: `Lotteries are hereby prohibited in this State' ..." and that "the courts should interpret and apply the statute in prosecutions under it so as to enforce the command of the constitution...." 135 Fla. at 743, 185 So. at 877.
Without ever expressly overruling or formally receding from Lee, the court seemed to drift away from the holding of Lee in at least two post-Lee opinions. A popular 1930s practice called "bank night" was challenged in Little River Theatre Corp. v. State ex rel. Hodge, 135 Fla. 854, 185 So. 855 (1939). Bank night was a particular night each week when a theater would randomly draw a number in order to immediately give away a cash award. The numbers corresponded to the names of people who had entered the contest and who were not required to make a purchase to register or to collect the award. Because the drawings were held in the theaters often during a feature, it was observed that most winners had purchased theater tickets and that it was at least practically advantageous to have done so. In Little River Theatre, the supreme court was faced with the question of whether one theater's bank night violated the lottery statute. The court quoted extensively from the high courts of other states and, adopting their methodology, concluded that the three elements of a lottery were first, a prize; second, an award by chance; and third, consideration. Applying these to the facts of the case, the court found bank night to be a lottery prohibited by Florida's lottery statute. The court cited Lee when, in explaining the facts of the case, it stated that the public was generally invited to register for the event, but no attention was given to Lee's requirement that the infection of the device pervade an entire community or county. On the same day the court decided Little River Theatre, an identical result was reached in the case of Gulf Theatres, Inc. v. State ex rel. Ferguson, 135 Fla. 850, 185 So. 862 (1939).
After its enactment in 1967, the bingo statute[9] was immediately challenged as violative of the constitutional prohibition against lotteries,[10] and one circuit court declared it unconstitutional. By the time the appeal of that decision was heard in the supreme court, however, the 1968 constitution had taken effect. The anti-lottery provision of the new constitution stated:
Lotteries.Lotteries, other than the types of pari-mutuel pools authorized by law as of the effective date of this constitution, are hereby prohibited in this state.
Fla. Const. art. X, § 7 (1968). Although the circuit court's ruling had been based on the 1885 constitution, the supreme court considered the legitimacy of the bingo statute under both the 1885 and the 1968 constitutions. Greater Loretta, 234 So.2d 665.
A sharply divided court upheld the law. The dissenting view of three justices, authored by Justice Carlton, argued that bingo was unmistakably a lottery prohibited by the 1885 constitution and that, since the lower court had declared the bingo statute unconstitutional prior to the ratification of the new constitution, bingo could not be legitimized through the 1968 constitution by virtue of having been of the types of pari-mutuels that were previously authorized by law. Id. at 673-689. The majority did not quarrel with Justice Carlton's conclusion that bingo met the three-part definition of lottery by then generally applied by Florida courts,[11] but concluded that in order to declare the bingo statute unconstitutional, Lee must be overruled. Stare decisis, according to the court, *1179 would preclude the court taking such action. Id. at 668. Acknowledging that its precedents had been less than clear as to what amounted to a lottery under the constitution, the supreme court explained that the legislature could legitimately have chosen to rely on one valid case (Lee) over another when interpreting a constitutional provision and, accordingly, held bingo not to be a lottery under the 1885 constitution. Id. at 668-69. The court also observed that much the same legislature which produced the bingo statute in 1967 produced article X, section 7, of the 1968 constitution. As to the current constitution, the court concluded that the legislature excluded bingo from the prohibition against lotteries in the 1968 constitution by including it among authorized pari-mutuels:
Those activities comprehended as "parimutuel pools" were recognized as lotteries but those in existence and lawful under the case law or legislative statutes prior to January 7, 1969, were "grandfathered in" as exceptions to the prohibition. "Parimutuel pools" is a term applied to horse racing, jai alai, and dog racing and certainly includes bingo by definition.
Id. at 671.
Plainly, Greater Loretta teaches that bingo is both a lottery and a pari-mutuel and that the legislature may authorize bingo to be conducted in Florida because it is one of the pari-mutuels "grandfathered in" by the 1968 constitution. Greater Loretta appears to hold that, under the 1968 constitution, "lottery" took on a greater meaning than previously understood, encompassing "parimutuels" such as dog racing, horse racing, jai-alai and bingo, all of which the new constitution expressly excepted from the lottery prohibition. Thus, it appears that all seven justices in Greater Loretta concluded that the word "lottery" in the current constitution includes the game of bingo. Further, the term "lottery" as used in Florida Statutes apparently should be read in the same way since the lottery statute is supposed to effectuate[12] the constitutional provision. Jarrell and Hardison. The state's complaint and affidavit sufficiently allege that the defendants, as persons not authorized to conduct bingo under Florida law, set up, promoted, or conducted a lottery in violation of section 849.09. Consequently the trial court did not err in denying the motion to dissolve.

c. Certification.
We also conclude, however, that it is appropriate to certify this question for resolution by the supreme court. Although we believe the analysis set forth above, and in particular the Greater Loretta decision, dictate the result we have reached, we are also aware that certain of the defendants in this case and other similarly situated persons or entities have been sued in Manatee County circuit court and have prevailed on the same civil RICO claim.[13] Reportedly, there are hundreds of "commercial bingo halls" in the State of Florida[14] and the issue of whether their operation in violation of the bingo statute's limitations constitutes the criminal offense of lottery gambling needs to be decided promptly and in a consistent and definitive way. Accordingly, we certify to the Supreme Court of Florida as a question of great importance:
WHETHER A BINGO GAME, CONDUCTED BY AN ORGANIZATION NOT AUTHORIZED UNDER SECTION 849.0931, FLORIDA STATUTES, OR CONDUCTED BY AN AUTHORIZED ORGANIZATION IN VIOLATION OF SECTIONS 849.0931(5)-(12), FLORIDA STATUTES, CONSTITUTES A "LOTTERY" AS THAT TERM IS USED IN SECTION 849.09, FLORIDA STATUTES, AND, THUS, IS RACKETEERING ACTIVITY WHICH IS SUBJECT TO FLORIDA RICO.

IV. The State's Appeal.
On the state's appeal, we begin again by rejecting the contention that the *1180 trial court lacked jurisdiction to enter the appealed order requiring it to post a bond. The state reasons that the trial court was deprived of jurisdiction once the defendants filed their notice of appeal regarding the trial court's earlier order denying their motion to dissolve the injunction. This argument misapplies the principle that, once the jurisdiction of the appellate court is invoked, the cause becomes one for resolution by that court alone, and the lower court loses jurisdiction over the subject matter of the appeal. See, e.g., Thursby v. Stewart, 103 Fla. 990, 1011-12, 138 So. 742, 751 (1931); Johnson v. Circuit Court, Eighteenth Judicial Circuit, 686 So.2d 723 (Fla. 5th DCA), review denied, 697 So.2d 511 (Fla.1997); Soles v. Soles, 536 So.2d 367, 368 (Fla. 1st DCA 1988); Waltham A. Condominium Ass'n v. Village Management, Inc., 330 So.2d 227, 233 (Fla. 4th DCA 1976). The lower court is prohibited only from altering the order or acting in any manner with respect to its appealed order as might frustrate the efforts of the appellate court or render moot its labors.
We cannot see how the trial court's decision to require the state to post a bond interfered with this court's jurisdiction to resolve the defendants' appeal. The defendants' motion to dissolve the injunction did not concern the bond, or the lack of one. In fact, the trial court deferred consideration of the bond until after it resolved the legal challenges to the injunction. Although the trial court may have been powerless to actually dissolve the injunction in the event the state failed to produce the required bond, since such an order would interfere with this court's ability to resolve the defendants' appeal,[15] this does not mean the court could not order the state to post a bond.
The state next argues that the defendants were required to demonstrate a change in circumstances in order for the trial court to modify the injunction by imposing a bond. Discussing no evidence adduced at the hearing below, the state merely concludes that the defendants failed to suggest any change in circumstances. A trial court, however, may adjust a bond requirement upon a demonstration that such would be equitable under the circumstances, as where the amounts on deposit are inadequate. See Parker Tampa Two, Inc. v. Somerset Devel. Corp., 544 So.2d 1018, 1021 (Fla.1989); World Sec. Fund v. Schmidt, 406 So.2d 511, 513 (Fla. 3d DCA 1981), review denied, 413 So.2d 877 (Fla.1982). Here, the defendants produced evidence that they had incurred substantial operating losses during the twelve months the injunction had been in place, and that more losses were expected should the injunction remain.
The state next contends that the decision to require the state to post a bond was an abuse of the trial court's discretion. The state complains that requiring it to post a bond wields a crushing blow to law enforcement efforts to ensnare ongoing criminal enterprises. The state claims that it will become forced to chose between two "unpalatable" options: placing at risk vast sums of public monies or declining to file suit against offenders who have amassed large amounts of criminal proceeds. We are not persuaded by this argument. However uncomfortable the state may be with posting injunction bonds, it is indisputable that the very broad injunction the state requestedand receivedwill severely damage the defendants if its entry was improper. Subsection (5) of section 895.05, Florida Statutes, states in part:
Pending final determination, the circuit court may at any time enter such injunctions, prohibitions, or restraining orders, or take such actions, including the acceptance of satisfactory performance bonds, as the court may deem proper.
As the state thrives under the broad grant of authority to the circuit court in subsection (5), so it must suffer under it.
AFFIRMED.
COBB and ANTOON, JJ., concur.
NOTES
[1] Unless otherwise indicated, all statutory references will be to the 1993 version of the Florida Statutes.
[2] See Fla. R.App. P. 9.310(b)(2).
[3] Section 895.05(5), Florida Statutes (1993), states:

(5) The Department of Legal Affairs, any state attorney, or any state agency having jurisdiction over conduct in violation of a provision of this act may institute civil proceedings under this section. In any action brought under this section, the circuit court shall proceed as soon as practicable to the hearing and determination. Pending final determination, the circuit court may at any time enter such injunctions, prohibitions, or restraining orders, or take such actions, including the acceptance of satisfactory performance bonds, as the court may deem proper.
[4] We note that the Attorney General has interpreted subsection (3) to refer only to "charitable, nonprofit or veterans' organizations" as that term is defined by § 849.0931(1)(c). Op. Att'y Gen. Fla. 94-7 (1994). We express no opinion about the propriety of this interpretation. We note, however, that this interpretation appears inconsistent with the allegation in the state's complaint that the defendants violated § 849.0931(3) by not returning all bingo proceeds in the form of prizes.
[5] Subsection 849.09(3), Florida Statutes, in essence, says that authorized bingo is not punishable under the lottery statute, which is consistent with our reading of the statutory scheme.
[6] We note that the Attorney General once held the view we express today. In Fla. Att'y Gen. Op. 78-87 (1978), it was stated:

I further observe that the penalty for a violation of playing bingo in a fashion contrary to the manner set out in s. 849.093, supra, is that of a misdemeanor in the first degree. That applies only to organizations or entities who are qualified to play bingo under the statute, but do it in contravention thereof.
Id. More recently, however, the Attorney General has taken a contrary position, opining that authorized bingo operators who fail to follow the statutory regulations for the conduct of bingo games would or might be conducting "illegal lotteries." See, e.g., Op. Att'y Gen. Fla. 95-21 (1995); Op. Att'y Gen. Fla. 92-91 (1992).
[7] Article III, § 23, of the 1885 constitution declared, "Lotteries are hereby prohibited in this State."
[8] Lee's definition of lottery is seen again in the supreme court's opinions. For example, in Victor v. State, 141 Fla. 508, 514, 193 So. 762, 764 (1939), the court held:

It is a matter of common knowledge that the game known as "New York Bond" is a scheme for the distribution of prizes by lot or chance which has infected the whole of Hillsborough county. It is a lottery within the constitutional prohibition.
141 Fla. at 514, 193 So. at 764.
[9] Ch. 67-178, § 1, Laws of Fla.
[10] Fla. Const. art. III, § 23 (1885).
[11] See Gulf Theatres; Little River Theatre Corp.; M. Lippincott Mortg. Inv. Co. v. Childress, 204 So.2d 919, 921 (Fla. 1st DCA 1967); Blackburn v. Ippolito, 156 So.2d 550 (Fla. 2d DCA 1963), cert. denied, 166 So.2d 150 (Fla.1964); see also Fla. Std. Jury Instr. (Crim.) 205 (defining the elements of a lottery under § 849.09 to be a consideration, a prize, and the award or winning of the prize by lot or chance).
[12] Jarrell, 135 Fla. at 743, 185 So. at 877.
[13] The circuit court's dismissal of the RICO claim was affirmed, per curiam, by the Second District Court of Appeal. State v. 959 Hall for Hire, Inc., 689 So.2d 1080 (Fla. 2d DCA 1997). We have obtained and reviewed the briefs in that appeal and find the civil RICO issue raised there to be virtually identical to the issue before us.
[14] Report No. 1 of the Twelfth Statewide Grand Jury Regarding the Operation of Commercial Bingo Halls in the State of Florida, p. 7, S.Ct. Case No. 83,964 (Oct. 25, 1995).
[15] Cf. Florida Dry Cleaning and Laundry Bd. v. Everglades Laundry, 138 Fla. 646, 647, 190 So. 33, 33-34 (1939); Thursby.