THOMPSON, C.J.
Appellants, Bee Line Entertainment Partners, LTD., Bee Line Entertainment, Inc., Seminole Entertainment, Inc., Premier Entertainment of Central Florida, Inc., James P. Veigle, (as director of Bee Line Entertainment, Inc., director of Beeline Investments, Inc., and director of Premier Entertainment of Central Florida, Inc.), Charles H. Veigle, (as director of Bee Line Entertainment, Inc., director of Bee Line Investments, Inc., and director of Premier Entertainment, Inc.), Nancy Voegtlin, (as secretary of Bee Line Entertainment, Inc., secretary of Bee Line Investments, Inc., vice president and secretary of Seminole Entertainment, Inc., and secretary of Premier Entertainment, Inc.), and Robert G. Kelley, (as president of Seminole Entertainment, Inc.) (collectively, “appellants”) timely appeal the “Order Denying Motion to Dissolve Order Granting Temporary Injunction and Other Preliminary Relief, or, in the Alternative, Modify the Order and Require the State to Post Bond,” entered on August 7, 2000. This Court has jurisdiction over this non-final appeal pursuant to Florida Rules of Appellate Procedure 9.030(b)(1)(B) and 9.130(a)(3)(B).

FACTS

On July 20, 2000, the state filed its complaint against the appellants, alleging that the appellants taken together constituted an “enterprise” that engaged in a “pattern of racketeering activity” such that the state should be entitled to a judgment forfeiting appellants’ property, and other relief, pursuant to the Florida RICO (Racketeer Influenced and Corrupt Organization) Act, Chapter 895, Florida Statutes (2000). The “enterprise,” to simplify the facts of this case, was the operation of two night clubs in central Florida, generally known as “Rachel’s North” and “Rachel’s South.” The complaint alleged that there were eight different laws violated by the appellants, and 53 instances of such laws being violated, either at these two clubs or near these two clubs in limousines, sometimes provided by the clubs. The state demanded a trial by jury and sought relief as contemplated by Florida’s RICO law.
At the same time the complaint was filed, the state’s “Motion for Temporary Injunction and Other Preliminary Relief’ was filed, along with two affidavits. The motion for temporary injunction summarily reiterated the allegations of the complaint and then listed the specific properties the state believed would be forfeited at the conclusion of the case. The state asked for preliminary injunctive relief, without prior notice to the appellants, because the assets could be easily dissipated and business records easily destroyed if *1200appellants had notice beforehand. Moreover, the state asked that no bond be required, as it would not be in the public interest for the state to post a bond. The state asked for twelve forms of relief in the motion for temporary injunction:
i) Grant temporary and permanent injunctions against the appellants, enjoining them from violating the criminal laws that were violated and led to this civil RICO action;
ii) Subject the appellants’ personal property to immediate court supervision, and order them to refrain from disposing of or otherwise altering the property without prior approval of the court, including the escrowing and/or forming of a constructive trust of all interest income payments, receivables, transfers, and gifts representing payment for the transfer of any assets;
iii) Authorize the state to take the necessary steps to secure and preserve any cash and negotiable instruments found on the premises, as those items of personal property are easily dissipated;
iv) Direct the appellants, their officers, agents, servants, employees, attorneys, etc. to, upon service of the court’s order, provide immediate access to the premises where they conduct their business or where records of the appellants’ business activities were stored or maintained to provide immediate access in order for the state to inspect any and all material that may be relevant to the action, including documents, books, records, accounts, computer data, tapes and any material relating to the appellants’ assets. The state asked the trial court to direct that the state be allowed to copy or secure any of these materials, as well;
v) Require the appellants to maintain all business and financial transaction records;
vi) Enjoin Citrus Bank, Colonial Bank, and any other financial institution or brokerage house from selling, transferring, or otherwise disposing of the contents of appellants’ bank accounts;
vii) Require Citrus Bank and Colonial Bank to file with the court and serve upon the state and account holders, within three business days of the date of service of the court order, a certified statement setting forth the balance in each such account, as of the close of business on the day on which the order is served, or, if the account had been closed, the date closed and the destination of the funds, if known;
viii) Authorize the state to commence pre-trial discovery directed toward locating appellants’ assets upon service of the court order;
ix) Require appellants to provide, within 10 days of service of the court order, a copy of the order to all of appellants’ agents, employees, representatives, etc.;
x) Direct the Clerk of the Court to remove and place under seal one of the two affidavits submitted with the motion for injunction;
xi) Authorize all of the foregoing without a bond; and
xii) Grant such other and further relief as the court deemed just and proper.
Submitted with the motion for entry of an injunction were two affidavits. The first affidavit is 223 pages long, and was sworn to by two law enforcement officers, Agents Ray Peters of the Metropolitan Bureau of Investigation for the Orange County Sheriffs Office and M.J. Laney of the City/County Investigative Bureau.1 *1201As opposed to the complaint’s and the motion for injunction’s antiseptic descriptive language concerning the clubs and the alleged illegalities taking place within and near them, this affidavit is filled with lewd, lascivious, and tawdry details.
The affidavit states that the investigation leading to the current RICO civil ease was commenced in January 2000, and was conducted jointly by the Metropolitan Bureau of Investigation, the City/County Investigative Bureau, the State of Florida Division of Alcoholic Beverages and Tobacco, the Attorney General’s Office, the Office of Statewide Prosecution, and the State Attorney’s Offices in the Ninth and Eighteenth Judicial Circuits. The undercover officers began appearing at these clubs and immediately learned how to buy drugs in the club from the dancers, learned of “two-girl sex shows” arranged for customers of the clubs, learned of drug use taking place within the clubs, and observed a customer digitally penetrate the vagina of one of the dancers.
Over the course of the next several months, the undercover officers would return to the clubs and pay large sums of money to be treated as “VIPs.” That, in turn, led to the officers having the opportunity to pay for “two-girl sex shows” both in the clubs and in limousines arranged for by the club or brought in by law enforcement, and for the dealing of drugs via a connection arranged by employees of the club. The women who put on the sex shows were paid in cash. The way this usually worked is that the officers would give a credit card to a manager of the club, the manager would charge $1540 onto the credit card, and $1400 in cash would be returned to the officer. $140 would be kept by the house as a kind of cash advance “fee.” The officer would then pay the women $700 each for the show and the show would take place. This type of activity, with varying detail, is recounted numerous times in the affidavit.
Similarly, drug purchases were arranged through managers of the clubs, with the manager connecting an officer to a drug dealer. The officer would give his credit card to the manager, who would charge the price of the drugs on the card, along with a 10% fee. The manager would give the cash, minus the fee, to the officer, who would then pay off the drug dealer. Other types of sex shows and various episodes of drug use were alleged to have taken place in the clubs, but the above descriptions reflect the scenes most often repeated in the affidavit.
Larry A. Schuchman, a financial Investigator with the Office of the Attorney General, was the affiant in the second affidavit. Schuchman reviewed the various official records involved in appellants’ business ventures, including property appraiser records, Florida Secretary of State records, beverage license applications, and investigative reports; after doing so, he testified, he had reason to believe that the appellants taken together comprised a RICO enterprise, as described in Chapter 895.
On July 20, 2000, at 6:05 p.m., Judge Waller of Orange County granted the state’s motion for temporary injunction. All the relief requested for in the motion, as detailed above, was granted. Subsequently, on July 28, 2000, the appellants filed their “Motion to Dissolve [the Ex Parte] Order Granting Temporary Injunction and Other Preliminary Relief, or in *1202the Alternative, Modify the Order and Require the State to Post Bond.”
A hearing on this motion was held on August 2, 2000. The state and the appellants argued over who had the burden of proof, and Judge Kirkwood, who now was hearing the case, reviewed the affidavits and then instructed the state to present its witnesses, implicitly indicating he believed the state had the burden of going forward.2 The state immediately acknowledged that of the twelve bank accounts appellants asserted were improperly “frozen,” seven had been “released by stipulation.”
Three law enforcement officers testified on behalf of the state. Some of their testimony was hearsay, some of it was testimony describing circumstances they had observed themselves, and some of it was derived from records seized pursuant to the injunction. Although the appellants lodged many objections to the hearsay, the objections were overruled. Much of the testimony reiterated the facts described in the affidavits.
Following their testimony, the trial court ruled in favor of the state, refusing to modify or dissolve the injunction.

LAW APPLIED TO FACTS

Before addressing the issues raised in this appeal, a brief introduction to RICO is in order. In 1977, the Florida Legislature:
determined that organized crime was using vast amounts of money, violence, and intimidation to infiltrate and corrupt legitimate business within Florida. In an effort to eliminate infiltration of legitimate businesses by racketeers, the legislature enacted the Florida RICO (Racketeer Influenced and Corrupt Organization) Act.
Raymer F. Maguire III, Racketeers and Non Racketeers Alike Should Fear Florida’s RICO Act, 6 Fla. St. U.L.R. 483 (1978). Florida’s RICO law was patterned after the federal RICO law, see id., enacted in 1970 and used successfully against a wide variety of defendants.
Like the federal RICO law, Florida’s RICO law has both a civil and a criminal component. See §§ 895.04, 895.05, Fla. Stat. (2000). In the instant case, the state has brought a civil RICO action against the appellants. “The civil remedies of section 895.05 are available for violations of chapter 895, which primarily targets individuals engaged in a ‘pattern of racketeering activity.’ ” Jennifer Daley, Tightening the Net of Florida’s RICO Act, 21 Fla. St. U.L.Rev. 381, 392 (1993). “Racketeering activity” is defined broadly by Florida’s RICO law. The pertinent portions are as follows:
895.02. Definitions
As used in ss. 895.01-895.08, the term:
(1) “Racketeering activity” means to commit, to attempt to commit, to conspire to commit, or to solicit, coerce, or intimidate another person to commit:
(a) Any crime which is chargeable by indictment or information under the following provisions of the Florida Statutes:
12, Chapter 562, relating to beverage law enforcement.
H? ‡ & ‡
21. Section 796.03, s. 796.04, s. 796.05, or s. 796.07, relating to prostitution.
;Jí ifc # # #
38. Chapter 893, related to drug abuse prevention and control.
*120339. Chapter 896, relating to offenses related to financial transactions.
As the record is replete with allegations and evidence of these types of crimes, it is no surprise that the state has brought this civil RICO complaint against the appellants.
The appellants argue that in order to seize or freeze their property— multiple bank accounts and numerous corporate records and equipment — the state had the burden of making a prima facie case demonstrating that it will be successful in this litigation. De Lisi v. Smith, 401 So.2d 925, 928 (Fla. 2d DCA 1981). According to De Lisi, to meet this burden the state must show that the property it wants to prevent the appellants from disposing of was used in the course of, intended for use in the course of, derived from, or realized through, conduct in violation of the RICO act. See De Lisi, 401 So.2d at 928. Moreover, that burden would only be met if the state presented substantial, competent evidence tying the property to the illegal conduct. See Shouten v. Utah Int’l, Inc., 515 So.2d 366 (Fla. 4th DCA 1987). The appellants submit that the state has failed to meet that burden, suggesting that there was no evidence tying the bank accounts to the illegal conduct.3
De Lisi is almost directly on point. In De Lisi, the attorney general filed a civil action seeking forfeiture, injunction, and other relief against the defendants. De Lisi, 401 So.2d at 926. The attorney general also filed an ex parte application for preliminary relief, and the trial court en*1204tered an order directing the defendants to refrain from disposing of, transferring, assigning, relocating, dissipating or otherwise altering the status of any of their properties without prior approval of the court, “except that Defendants are permitted to make normal disbursements from the accounts of their lawful business interests ... for the normal daily operation of such business interests, and to make normal disbursements for day to day living expenses.” Id. at 927. De Lisi and the instant case are very similar, except that the order in the instant case is much stricter, in that it does not allow the appellants to make normal disbursements from their accounts for lawful business reasons, without court supervision.
In De Lisi, the trial court partially granted the defendants’ motion to quash the temporary injunction, but kept in place the order not to transfer assets. Id. The only difference between De Lisi and the instant case is that the hearing on the motion to quash in De Lisi did not involve the introduction of evidence, id. at 927, whereas the hearing in the instant case did involve testimony and evidence produced by the state. The Second District Court of Appeal reversed in De Lisi, and remanded for an evidentiary hearing, concluding that the attorney general had the burden to make:
“a prima facie case that he will be successful in his suit. He will also have to make some showing that the property which he wishes to prevent appellant from disposing of was ‘used in the course of, intended for use in the course of, derived from, or realized through, conduct in violation of the RICO Act.”
Id. at 928.
In the instant case, the appellants submit that the state did not meet this test and we agree, not in small part because the state agreed below, as well. The state acknowledged below that seven of the bank accounts put under court supervision by the trial court’s injunction were “released” by the state. The state noted that the accounts not released could be tied to the RICO enterprise, which indicates the state recognized it could not present evidence showing that the money in these “released” accounts was derived from the RICO enterprise. This is an admission by the state that the injunction was overly broad, yet the trial court did not modify the injunction. Moreover, there is nothing in the appendix to demonstrate that the state followed through on its promise to stipulate to the release of these seven accounts. Since even the state recognized below that the injunction was overly broad and swallowed up property potentially outside the RICO enterprise, the injunction must be re-drawn to meet the strictures of De Lisi.4,
Next, appellants contend that the open ended search and seizure provision of the injunction5 was wholly unconstitutional *1205on its face, as it allowed the state to seize appellants’ property without a warrant or any other legal justification. The RICO act allows for this type of seizure “upon court process” and in other instances not applicable to this case. See § 895.05(3), Fla. Stat. It is our responsibility to balance the requirement that forfeiture statutes be interpreted strictly with the “traditional judicial policy that all doubts as to the validity of a statute are to be resolved in favor of constitutionality where reasonably possible.” Dep’t of Law Enforcement v. Real Property, 588 So.2d 957, 961 (Fla.1991). To meet those two duties we interpret section 895.05(3), allowing seizure “upon court process,” to mean that the order obtained “upon court process” is based on probable cause sufficient to obtain a warrant under Article 1, Section 12 of the Florida Constitution. See id. at 964 n. 12. The RICO law, although a powerful tool for law enforcement, does not trump the constitution. Because the state demonstrated probable cause, this provision of the injunction meets constitutional muster.
Appellants next argue that the trial court abused its discretion in not requiring the state to post a bond. We find no abuse of discretion. See Fla. Rule of Civ. P. 1.610(b). Appellants rely on Dep’t of Legal Affairs v. Bradenton Group, Inc., 727 So.2d 199 (Fla.1998), but the case is distinguishable. According to the lower court’s opinion which led to the supreme court opinion, “the defendants produced evidence that they had incurred substantial operating losses during the twelve months the injunction had been in place, and that more losses were expected should the injunction remain.” See Bradenton Group v. Dep’t of Legal Affairs, 701 So.2d 1170, 1180 (Fla. 5th DCA 1997), approved in part, quashed in part, 727 So.2d 199 (Fla.1998). In the instant case, appellants put on no evidence to demonstrate that they would incur losses because of the injunction.
Lastly, the appellants submit that the affidavits relied on below, and a large part of the officers’ testimony, were filled with hearsay that should not have admissible at this preliminary injunction stage. First, it should be noted that the trial court, in considering whether to grant the ex parte injunction, was required by rule to consider the affidavits. See Fla. R. Civ. P. 1.610. Appellants’ point, however, is not so much that any affidavits were considered by Judge Waller and then Judge Kirkwood, but rather that the affidavit sworn to by officers Peters and Laney was “chock full” of hearsay, and not evidence within their personal knowledge.
In deciding whether the admission of hearsay evidence was appropriate during a hearing concerning the entry of a preliminary injunction, a number of courts have held that “the court may rely on hearsay evidence and may even give inadmissible evidence some weight.” Credit Cheque Corp. v. Zerman, 1997 WL 810020 *2 (N.D.Tex.1997); see also Levi Strauss & Co. v. Sunrise Int’l Trading, Inc., 51 F.3d 982, 985 (11th Cir.1995); Asseo v. Pan American Grain Co., Inc., 805 F.2d 23, 26 (1st Cir.l986)(“Affidavits and other hearsay materials are often received in preliminary injunction proceedings. The dispositive question is ... whether, weighing all the attendant factors, including the *1206need for expedition, this type of evidence was appropriate given the character and objectives of the injunctive proceeding”). We agree with those courts, because there was more than just hearsay presented.
In conclusion, the trial court did not abuse its discretion in denying the request for the state to post bond, and the introduction of hearsay during the injunction proceeding, when coupled with the ample non-hearsay evidence, was not an abuse of discretion. However, the injunction was overly broad. We agree that an injunction was appropriate and it remains in place, but it must be modified. For this reason, the portion of the order denying its modification is reversed and the cause is remanded for proceedings in accordance herewith.
REVERSED in part, AFFIRMED in part, REMANDED.
HARRIS and PLEUS, JJ., concur.

. At the later hearing on the motion to dissolve injunction, it was discovered that the copy of the affidavit sealed in the file was in fact unsigned by either of the officers or the *1201judge who initially entered the ex parte injunction on the strength of the affidavit. The appellants attack the validity of the affidavit in their initial brief, but the record of the hearing reveals that the attorney for the state and the affiants all testified that the original affidavit was executed properly before the earlier trial judge.

. Since the state does not contest that decision, we do not address that issue.

. The primarily applicable portion of the order provides:
E. Citrus Bank and Colonial Bank are hereby directed immediately to cease any disbursements from any and all accounts of Defendants, including but not limited to:
(a) Account Number 063113772; 06032745, held in the name of Defendant BEE LINE ENTERTAINMENT PARTNERS, LTD., FEI # 59-3171209, at Citrus Bank, 2861 S. Delaney Ave., Orlando, Florida, and any other accounts in the name of BEE LINE ENTERTAINMENT PARTNERS, LTD, including but not limited to checking accounts, savings accounts, investment accounts, tax accounts, credit card or credit card processing, safe deposit boxes, and in addition, to include any and all accounts in the name of Rachel's World Class Men's Club, a/k/a Rachel's, a/k/a Rachel’s Steakhouse; BEE LINE ENTERTAINMENT, INC., FEI #59-3170852; BEELINE INVESTMENTS, INC., FEI # 59-3183513; SEMINOLE ENTERTAINMENT, INC., FEI #59-2997672, d/b/a Rachel’s Restaurant and Lounge; Premier Entertainment of Central Florida, Inc. FEI #59-3170854; and any and all accounts on which the following individuals have signature authority: JAMES P. VEIGLE, SSN 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; CHARLES H. VEIGLE, SSN 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; NANCY VOEGTLIN, SSN 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; and ROBERT G. KELLEY, SSN 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.
(b) Account Number 063112032; 070224218, held in the name of Defendant SEMINOLE ENTERTAINMENT, INC., d/b/a Rachel’s World Class Men’s Club, d/b/a Rachel's Restaurant and Lounge, a/k/a Rachel’s Steakhouse d/b/a Rachel's Restaurant and Lounge, FEI # 59-2997672, at Colonial Bank, 201 E. Pine St., Orlando, Florida, and any other accounts in the name of SEMINOLE ENTERTAINMENT PARTNERS, LTD, including but not limited to checking accounts, savings accounts, investment accounts, tax accounts, credit card or credit card processing, safe deposit boxes, and in addition, to include any and all accounts in the name of BEELINE ENTERTAINMENT PARTNERS, LTD., FEI # 59-3171209; BEE LINE ENTERTAINMENT, INC., FEI #59-3183513; PREMIER ENTERTAINMENT OF CENTRAL FLORIDA, INC., FEI #59-3170854; and any and all accounts on which the following individuals have signature authority: JAMES P. VEIGLE, SSN 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; CHARLES H. VEIGLE, SSN 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; NANCY VOEGTLIN, SSN 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; and ROBERT G. KELLEY, SSN 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.

. There is no question that the court had the equitable power to put bank accounts under court supervision. Cf. Hudson Nat’l Bank v. Shapiro, 695 F.Supp. 544 (S.D.Fla.1988). The problem for the state is there was no showing that the broad language of the injunction would only put under court supervision bank accounts related to the RICO enterprise.

. "The Defendants, their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of this injunction are hereby directed to allow the State’s representatives, upon service of this order, immediate access to the premises where they conduct their business or where records of their business activities are stored or maintained, including 401 East Semoran Blvd., Casselberry, Seminole County, Florida, and 8701 South Orange Avenue, Orlando, Orange County, Florida. The purpose of this access shall be to inspect any and all material that *1205may be relevant to this action, including but not limited to documents, books, records, accounts, computer data, tapes and any materials relating to the Defendants' assets. In providing such access, the Defendants and their employees shall provide any and all passwords and other assistance necessary to obtain access to any computer records. The State’s representatives may remove documents from such premises so they may be inspected or copied and secured and preserved, pending further order of this Court.”